Fawick Corporation v. Commissioner.
Fawick Corp. v. Commissioner
Docket No. 3488-62.
United States Tax Court
T.C. Memo 1964-35; 1964 Tax Ct. Memo LEXIS 301; 23 T.C.M. (CCH) 194; T.C.M. (RIA) 64035; February 14, 1964
*301 Held, pre-merger 1950 net operating loss sustained by petitioner corporation in business of manufacturing and selling motor trucks can not be carried over and offset against post-merger 1953 and 1955 income generated by business of manufacturing and selling industrial clutches and brakes which had been merged into the petitioner in 1952. Libson Shops, Inc. v. Koehler, 353 U.S. 382. Edward C. Crouch, Union Commerce Bldg., Cleveland, Ohio, and Richard R. Hollington, *302 Jr., for the petitioner. Eugene S. Linett, for the respondent. PIERCE Memorandum Findings of Fact and Opinion PIERCE, Judge: The respondent determined deficiencies in the income taxes of the petitioner corporation for its taxable calendar years 1958, 1959, and 1960, in the respective amounts of $46,192.16, $186,654.52, and $22,932.56. Numerous issues raised in the pleadings have been settled by the stipulated agreements of the parties; and these settlements will be given effect in a recomputation of petitioner's tax liabilities under Rule 50. As a result of said agreed settlements, the year 1960 is no longer involved in the case. The sole remaining issue presented for decision is, whether petitioner corporation is entitled to net operating loss carryover deductions in its taxable years 1958 and 1959, with respect to an operating loss sustained in 1954. Decision of the presented issue actually turns upon a subsidiary question, the propriety of carryover of a 1950 net operating loss to the earlier years 1953 and 1955. If that can not be done, then the 1954 loss will be absorbed by carryback and carryover to 1953 and 1955, leaving nothing thereof to be carried over *303 to the taxable years 1958 and 1959. The subsidiary question hinges upon whether the carryover to 1953 and 1955 is to be denied deduction (1) on the ground that control of the Federal Motor Truck Company by certain individuals was acquired for the principal purpose of securing the benefit of its net operating loss carryovers, within the meaning of section 129(a) of the 1939 Code or section 269(a) of the 1954 Code; and (2) if such was not the principal purpose of the acquisition, are said net operating loss carryovers nevertheless to be denied deduction because the income against which the offset is claimed was not produced by the same business which incurred the losses (see ). In the event that the Court herein determines that petitioner is entitled to the benefit of the net operating loss carryover deductions, the parties have agreed that certain adjustments to the amounts of the claimed carryovers are to be made. Findings of Fact The petitioner is a Michigan corporation which was organized in 1910 under the name of Bailey Motor Truck Company. Shortly thereafter, its name was changed to Federal Motor Truck Company; and it *304 retained said name until October 31, 1952. From its inception until June 30, 1954, petitioner was engaged in the manufacture and sale of motor trucks and parts, under the trade name "Federal." Sales of trucks and parts were made to commercial users in the United States, to Government agencies, and to customers in foreign countries. Petitioner's said manufacturing operations were conducted at its plant in Detroit, Michigan. As hereinafter shown, petitioner also engaged in other manufacturing activities from and after October 31, 1952, when another corporation, The Fawick Airflex Company, Inc., was merged into it. Petitioner filed a Federal corporate income tax return for each of the calendar years 1958 and 1959 with the district director of internal revenue at Cleveland, Ohio. The Fawick Airflex Company, Inc., (hereinafter called "Airflex") was an Indiana corporation, which was organized in December 1938. From its inception until October 31, 1952, it was engaged in the manufacture and sale of air-operated industrial clutches and brakes and related equipment. These products were manufactured for use in the petroleum industry, in paper mills, and on earth-moving equipment, power presses, *305 and rubber-processing machinery. The industrial clutches and brakes were not used on automotive vehicles (i.e., trucks and passenger automobiles). However, in 1951 Airflex began the development and experimental work on a heavy duty vehicular brake, which was designed for installation on trucks and other automotive equipment. Airflex's manufacturing operations, as well as its vehicular brake project, were carried on in Cleveland. As of October 31, 1952, petitioner corporation had 491,543 shares of no-par-value common capital stock outstanding, which were held by approximately 2,300 shareholders; and its stock was listed both on the New York Stock Exchange and on the Detroit Stock Exchange. Airflex, by contrast, was a closely held corporation. As of October 31, 1952, it had 516,600 shares of no-par-value common capital stock outstanding. Thomas L. Fawick, its president, owned 382,000 shares. He, members of his family, and his associates owned 472,500 shares, or 91.4 percent of the total number of shares outstanding. Airflex's shares were never listed or traded on any exchanges; and there were no public transactions in its shares from the time of its incorporation down to the date of *306 the merger (hereinafter described). For 2 or 3 years prior to 1952, the directors of Airflex had been concerned with the problem of further growth and development of the company. The directors had sought assistance from two investment banking houses in locating a company that Airflex could acquire, with a view to diversifying its products and to make more broad its financial base. It was hoped that by thus enlarging Airflex, the company would be in a better position to market its shares and secure the financing necessary for still further expansion. Up to late 1951, nothing had come of the directors' efforts to enlarge Airflex. Also by late 1951, the vehicular brake program had reached the point where pilot models were being made for installation on two commercial trucks and on a series of U.S. Government military vehicles. The company was pressed for space; and it was necessary that the engineering and design work be carried on in rented space, while the actual fabrication of component parts for the brakes had to be handled by subcontracts with outside firms. Thomas Fawick, president of Airflex and the inventor of the vehicular brake, believed that full-scale production of the *307 brake was fairly imminent, and that additional space and facilities for its further development and manufacture should be acquired forthwith. At about this same time, certain of the directors of Airflex became concerned to find some means whereby, in the event of Fawick's death, his large shareholdings could be disposed of, without stripping Airflex of cash in redeeming Fawick's shares. In January or February 1952, one of the directors who was also the executive vice president and general manager of Airflex (Richard Huxtable) conferred with the Cleveland resident partner (Raymond Ashman) of a national accounting firm that served Airflex, about the aforementioned problems of expansion, product diversification, financing, and share disposal. Shortly thereafter, in March 1952, Ashman advised Huxtable that another client of Ashman's firm (Federal Motor Truck Company of Detroit, Michigan) was likewise interested in diversifying its products and also in acquiring new personnel in its management. Ashman stated that Federal's shares were listed on the New York and Detroit stock exchanges; and that if Airflex and Federal were to merge, with Federal surviving the merger, those stock exchange *308 listings would be retained. Ashman further pointed out that if the Airflex stockholders exchanged their Airflex shares for those of the surviving Federal corporation, they would thereby obtain listed shares; and that, in the event of Fawick's death, brokers could more easily dispose of his shares than would be possible with a non-listed stock such as Airflex. Further, Ashman advised that by having a listed stock, new capital for expansion purposes could be more readily raised by the issuance and marketing of additional shares than would be possible by trying to sell shares in a small closely held corporation. The directors of Airflex expressed interest in the prospects of an Airflex-Federal merger. Thereafter throughout the spring and summer of 1952, conferences were held between Airflex's management and Federal's management. On-the-spot investigations were were made by the management group of each corporation of the plant and facilities of the other corporation. Each group also examined and analyzed the balance sheets and operating statements of the other for several preceding years, as well as estimates of future sales, expenses, and earnings. As the result of these conferences, *309 investigations and examinations, Airflex's management concluded that Federal had plant facilities not then in use which were adaptable to and available for carrying on the vehicular brake program, and that the motor truck manufacturing business was "compatible" with the vehicular brake program, not only in terms of the former's plant and facilities but also in that the trucks to be manufactured could be equipped with such brakes and thereby made more competitive with the products of other truck manufacturers. Airflex's management also were apprised of the fact that as of the end of 1951, Federal had approximately $900,000 remaining unused portion of a 1950 net operating loss, which was available for carryover to be applied against post-merger income. Airflex's management was also supplied by Federal's management with estimates of 1953 sales, on the basis of which an anticipated profit on truck manufacturing operations of $3,000,000 would be realized - an amount more than sufficient to absorb the unused portion of the 1950 net operating loss. An agreement of merger was entered into on September 10, 1952, by an between petitioner (then still known as Federal Motor Truck Company) and *310 Airflex. Pursuant thereto and effective as of October 31, 1952, the two corporations merged, with the petitioner continuing as the surviving corporation. The agreement of merger provided, inter alia, that the name of petitioner was to be changed to Federal Fawick Corporation, and that the outstanding shares of petitioner and Airflex were to be exchanged, share for share, for shares in the surviving corporation. Accordingly, as a result of the merger, petitioner had 1,008,143 shares outstanding of which 51.2 percent was owned by the former Airflex shareholders. Of the seven directors of the surviving corporation immediately following the merger, three had been prior to the merger, directors of Federal Motor Truck Company, while the remaining four directors had formerly been directors of Airflex. Two of the three former Federal directors severed their connection with petitioner in 1953; and the third former Federal director ceased to be an officer or director in 1954 or 1955. The respective businesses of both merging companies were continued by petitioner after the merger in three divisions. The manufacture and sale of motor trucks and parts continued in the Federal Motor Truck Division *311 located in Detroit. The manufacture and sale of air-operated industrial clutches, brakes, and related products continued in the Fawick Airflex Division located in the plant in Cleveland. The vehicular brake program was carried on in the Fawick Brake Division, and was transferred from Cleveland to Detroit where it occupied a portion of the motor-truck manufacturing plant. During 1953 and 1954 petitioner, in its Federal Motor Truck Division, manufactured and sold to the Government towing tractors and parts, pursuant to a contract dated May 9, 1952, between petitioner and the United States Air Force. In 1961, petitioner had taxable income of $271,787 which it received in final settlement of this contract. On June 30, 1954, petitioner sold all the assets of the Federal Motor Truck Division as a going business (except inventories on hand required for the completion of Government contracts, cash, accounts receivable and other intangible assets). Petitioner sustained a loss on this sale in the amount of $1,416,675. Petitioner then changed its name to Fawick Corporation, ceased manufacturing motor trucks and parts, and moved the properties of the Fawick Brake Division back to Cleveland. *312 All operations of the Federal Motor Truck Division were terminated in 1956 with a final write-off of all uncollected accounts receivable. For the years 1947 through 1951, petitioner (as Federal Motor Truck Company) reported taxable income (or loss), before application of loss carrybacks and carryovers, from its business of manufacturing and selling trucks and parts, as follows: Taxable income
Year
(or loss)
1947
$2,377.136
1948
148,382
1949
(1,241,156)
1950
(1,132,325)
1951
218,344
For its fiscal years ended November 30, 1948, through 1951, and for its fiscal period from December 1, 1951, to October 31, 1952, Airflex reported taxable income as follows: Fiscal year
ended Nov. 30
Taxable income
1948
$ 319,378
1949
280,471
1950
204,783
1951
1,125,208
Fiscal period
12/1/51-10/31/52
823,103
For the following years, petitioner's taxable income (or losses) before application of loss carrybacks and carryovers, were as follows: Federal
Motor
Truck
Airflex
Division
Total
Division
income
income
Year
income
(or loss)
(or loss)
1952
$141,318 *
($1,207,228)
($1,065,910)
1953
811,471
(248,092)
563,379
1954
514,719
(1,489,672)
(974,953)
1955
723,269
54,156
777,425
1956
889,972
(244,789)
645,183
1957
564,686
564,686
1958
86,849
(17,876)
68,973
1959
504,854
(2,750)
502,104
1960
554,574
(6,798)
547,776
1961
854,598
271,787
1,126,385
*313 Petitioner's net operating loss for 1950 in the amount of $1,132,325 was carried over and deducted from net or taxable income, as follows: For 1951
$ 218,344
1953
563,379
1955
350,602
$1,132,325
Petitioner's net operating loss for 1952 in the amount of $1,065,910 was carried over and deducted from taxable income as follows: For 1955
$ 426,823
1956
649,087
$1,065,910
Petitioner's net operating loss for 1954 in the amount of $974,953 was carried over and deducted from taxable income for succeeding years, as follows: For 1956
$ 6,096
1957
564,686
1958
68,973
1959
335,198
$974,953
Respondent, in his *314 statutory notice of deficiency, determined that petitioner was not entitled to the net operating loss carryover deduction which it claimed for each of the years 1958 and 1959. Opinion We take up first the question of whether the Supreme Court's decision in the case of , is effective to bar the net operating loss carryover deductions here involved. In order to decide whether petitioner is entitled to carry over portions of its 1954 net operating loss and to deduct the same from its income for the taxable years 1958 and 1959 here involved, we must actually consider the earlier years 1950 through 1955, to determine if petitioner was entitled to carry over a 1950 net operating loss sustained in its motor-truck manufacturing business and to deduct the same against (1) 1951 income from the same business; (2) 1953 income from the manufacture and sale of air-operated industrial clutches and brakes which was generated by its Fawick Airflex Division that had been brought into petitioner as a result of the merger of The Fawick Airflex Company, Inc., in 1952 (for 1953 its motor-truck manufacturing operations resulted in a loss); and *315 (3) against 1955 income realized partly from its motor-truck operations ($54,156) and partly from the clutch and brake operations ($723,269). Respondent does not question the carryover of the 1950 loss to 1951; and, to the extent of $54,156, he agrees that said loss is likewise permitted to be carried over to 1955. But, he contends that the Libson Shops case forbids the 1950 loss to be carried over and offset against post-merger 1953 and 1955 income from the clutch and brake operations. And if he is correct, it means that the 1954 net operating loss will first have to be applied against 1953 and 1955 post-merger income from the profitable clutch and brake operations; and when this is done, the 1954 loss will be absorbed, with nothing thereof remaining for carryover to the taxable years 1958 and 1959 which are here involved. In short, there is no argument as to the amount of the loss sustained by petitioner in 1954, or as to its character as a net operating loss, or as to petitioner's right to offset it against post-merger income. The fight here is over offsetting pre-merger losses from manufacturing and selling trucks and parts against post-merger income from manufacturing and selling *316 air-operated industrial clutches and brakes. We have concluded that the respondent is squarely supported in his determination here by the Libson Shops case and subsequent cases applying the rule in Libson Shops. See in addition to , the following cases: ; ; , certiorari denied , affirming a Memorandum Opinion of this Court; , on appeal (C.A. 7); , certiorari denied , reversing ; , affd. (C.A. 4) ; and , certiorari denied . In the Libson Shops case, supra, the same parties owned the stock of 17 corporations, 16 of which were engaged in the retail clothing business and 1 of which was engaged in rendering management services *317 to the others. Each of these 17 corporations filed separate income tax returns. The 16 sales corporations were merged into the management corporation (the same parties continuing in control); and the surviving corporation conducted the entire business as a single enterprise. Prior to the merger, 3 of the sales corporations had sustained net operating losses; and in the year following the merger, each of the stores formerly operated by these loss corporations continued to sustain operating losses, while the other 13 stores continued after the merger (as they had prior thereto) to realize profits from their operations. In its income tax return for the year following the merger, the taxpayer-surviving corporation claimed net operating loss carryover deductions based upon the pre-merger losses of the "loss" corporations. The Supreme Court in denying the carryovers held that the carryover privilege is not allowable unless there is a "continuity of business enterprise"; and that a prior year's loss can be offset against the current year's income only to the extent that such income is derived from the operation of substantially the same "business" which suffered the loss. The Court stated, *318 in part, as follows: The requirement of a continuity of business enterprise as applied to this case is in accord with the legislative history of the carry-over and carry-back provisions. Those provisions were enacted to ameliorate the unduly drastic consequences of taxing income strictly on an annual basis. They were designed to permit a taxpayer to set off its lean years against its lush years, and to strike something like an average taxable income computed over a period longer than one year. n5 There is, however, no indication in their legislative history that these provisions were designed to permit the averaging of the pre-merger losses of one business with the post-merger income of some other business which had been operated and taxed separately before the merger. What history there is suggests that Congress primarily was concerned with the fluctuating income of a single business. n6 * * *
The fact that § 129(a) is inapplicable does not mean that petitioner is automatically entitled to a carry-over. The availability of this privilege depends on the proper interpretation to be given to the carry-over provisions. We find nothing in those provisions which suggest that they *319 should be construed to give a "windfall" to a taxpayer who happens to have merged with other corporations. The purpose of these provisions is not to give a merged taxpayer a tax advantage over others who have not merged. We conclude that petitioner is not entitled to a carry-over since the income against which the offset is claimed was not produced by substantially the same businesses which incurred the losses. n9 [Footnotes omitted.] The other cases above cited applied the rule of the Libson Shops case to fact situations where a single "loss" corporation took on, by acquisition or merger into it, a profitable corporation or its assets; and sought thereafter to carryover the acquiring corporation's pre-merger losses and deduct the same from the income of the newly-acquired profit-making segment of its business. In said cases, the carryover deductions were held to have been properly disallowed by the respondent. The same situation prevails here. We think it clear that the Detroit Federal truck-manufacturing business was different in nature from the Cleveland Airflex clutch and brake manufacturing business. And we note too that majority ownership and control of the "loss" corporation *320 passed, by means of the merger, into new and different hands, those of the Airflex group. On the authority of the Libson Shops case and the other cases above cited, we accordingly hold that there was not here present the requisite continuity of business enterprise, and that the pre-merger 1950 net operating loss carryover could not be carried over to 1953 and 1955 and offset against income from petitioner's clutch and brake manufacturing operations. It follows that the 1954 loss must be offset against 1953 and 1955 post-merger income; and the result is that none of such loss remains to be carried over to 1958 and 1959, the taxable years here involved. So holding, we find it unnecessary to decide whether the principal purpose for the acquisition of control of the petitioner by the former Fawick Airflex stockholders was to evade or avoid tax by securing the benefit of Federal's net operating loss carryover deductions which would otherwise not be enjoyed. If there is no continuity of business enterprise, the deduction of a net operating loss is precluded, irrespective of whether section 129(a) of the 1939 Code, or section 269(a) of the 1954 Code applies. Libson Shops, Inc. v. Koehler; *321 Norden-Ketay Corporation v. Commissioner; Commissioner v. Virginia Metal Products, Inc., and Federal Cement Tile Co., all supra. decision will be entered under Rule 50. Footnotes
*. Represents post-merger income for 2-month period, November and December 1952. NOTE: As hereinabove found as a fact, petitioner's operations in its Federal Motor Truck Division were terminated in 1956. The losses shown in the above table for 1958, 1959, and 1960 represent amounts for legal and accounting fees for services rendered in contract settlement negotiations that culminated in petitioner receiving from the U.S. Government in the settlement, the $271,787 of income in 1961 shown in the above table.↩